IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| VANESSA HARRIS-ANDERSON,      ) | |
|                             ) | |
|     Plaintiff,           ) | |
|                             ) | |
| v.                          ) | No. 2:19-cv-02032 |
|                             ) | |
| QUINCE NURSING AND        ) | |
| REHABILITATION CENTER, LLC,    ) | |
|                             ) | |
|     Defendant.          ) | |

ORDER

Plaintiff Vanessa Harris-Anderson brings this action against Defendant Quince Nursing and Rehabilitation Center, LLC ("Quince") for common law retaliatory discharge and retaliatory discharge in violation of the Tennessee Public Protections Act ("TPPA"), Tenn. Code Ann. § 50-1-304. (ECF No. 1.) Before the Court is Quince's Motion for Summary Judgment, filed on January 30, 2020. (ECF Nos. 27-28.) Harris-Anderson responded on March 9, 2020. (ECF No. 35.) Quince replied on March 23, 2020. (ECF No. 36.)

For the following reasons, Quince's motion is GRANTED.

I.   Background

Quince is a nursing home located in Memphis, Tennessee. (ECF No. 35-2 ¶ 1.) Harris-Anderson served as Quince's Director of Food Services (Dietary Manager) from sometime in 2014 to August 2018. (Id. ¶ 2.) As Dietary Manager, Harris-Anderson ran the

dietary department and kitchen, served as the kitchen's sole member of management, and supervised 15-20 cooks, aids, and hostesses. (Id. ¶ 4.)   She was required to supervise food production, including serving the correct food to patients, and to purchase food and supplies.  (Id. ¶ 9.)

To receive federal funding, Quince must comply with federal regulations promulgated by the Center for Medicare and Medicaid Services and with Tennessee regulatory standards for nursing homes.  (Id. ¶ 16.)  The relevant federal and state regulations include general requirements that Quince meet the nutritional needs of residents in accordance with established national guidelines and recognized dietary practices.  (Id. ¶ 18.)  Neither the relevant federal nor the relevant state regulations state a specific amount of protein each resident must receive per day or meal.  (ECF No. 27-12 ¶¶ 7-8.)

A third-party company develops Quince's menus in accordance with national dietary standards, and Quince incorporates those standards into Quince's Menu and Diet Guidelines Policy ("Menu Guidelines").  (ECF No. 35-2 ¶ 20.)  Quince's Menu Guidelines list "6 Ounces of Edible Protein" as part of the "Daily Menu Requirements."  (ECF No. 28-3 at 2.)  A menu is developed seasonally in accordance with the Menu Guidelines for each meal, and that menu is placed in a binder in the kitchen weekly.  (ECF No. 35-2 ¶ 22.)  Each Friday, Harris-Anderson used those menus and

the recipes for each meal listed on the menu to calculate and order the amount of food needed for the following week.  (Id. ¶ 23.)

On Friday, August 3, 2018, Quince's menu listed a chef's salad with turkey as the protein for the primary meal at dinner.  (Id. ¶ 24.)  Both Harris-Anderson and Assistant Dietary Manager Branden Jewell worked Wednesday, August 1, 2018; Jewell did not work Thursday, August 2, 2018, and Harris-Anderson did not work Friday, August 3, 2018.  (Id. ¶ 25.)  The turkey for the August 3, 2018 dinner meal, if available, would have been frozen and placed in the refrigerator to thaw on August 1, 2018.  (Id. ¶ 26.)  Harris-Anderson did not check the refrigerator on Thursday, August 2, 2018 to confirm that the turkey was available and thawed for the next day's dinner meal service.  (Id. ¶ 27.)

On the afternoon of Friday, August 3, 2018, Jewell contacted Harris-Anderson and told her there was no turkey for the dinner meal.  (Id. ¶ 28.)  Harris-Anderson told Jewell that frozen chicken could be used as a substitute.  (Id. ¶ 29.)  Jewell approached Laura James, Quince's registered dietician, to inform her that there was no turkey for the dinner meal and asked that she make a menu change and substitute chicken for the turkey.  (Id. ¶ 30.)  James confirmed that there was no turkey in the kitchen and updated the menu to substitute chicken for turkey on the chef's salad.  (Id. ¶ 31.)  Cook Tracey Harris called Harris-Anderson at approximately 6:00 p.m. that night and notified her that the chef's

salad had been served without meat.  (Id. ¶ 32.)  Harris-Anderson contacted Jewell, who said he had insufficient time to thaw the chicken before the dinner meal was served.  (Id. ¶ 33.)

Harris-Anderson did not report the incident with the chef's salad to Selena Knox-Binion, Quince's executive director, over the weekend because Harris-Anderson knew she "was going to hear about it Monday morning" from Knox-Binion.  (Id. ¶ 34.)  Harris-Anderson did not contact anyone from the Tennessee Department of Health ("TDH") or the local Ombudsman[1] to report the chef's salad incident.  (Id. ¶ 36.)

On Monday morning, the local Ombudsman visited Quince.  (Id. ¶ 37.)  When Shirley Crump, the director of nursing, learned the Ombudsman was at Quince, she approached him while he was reviewing a bulletin board.  (Id. ¶ 38.)  The Ombudsman informed Crump he had received a complaint about the chef's salad.  (Id. ¶ 39.)  One of the residents had called the State of Tennessee and reported the lack of meat.  (ECF No. 35-3 at 71:7-12.)

---

[1] An Ombudsman is a local person who serves as a liaison to resolve problems between residents and long-term care facilities.  (ECF No. 27-2 ¶ 36 n.2)  The TDH ensures compliance with federal and state regulations through its survey and enforcement division made up of agents, known as surveyors, who inspect facilities, investigate complaints made about facilities, and issue deficiency citations if they find violations of federal or state regulations.  (Id.)  The Ombudsman cannot cite deficiencies or penalize facilities and instead reports concerns to the TDH.  (Id.)

The parties dispute the events that occurred during the Ombudsman's visit. At some point, Harris-Anderson spoke with the Ombudsman about the chef's salad incident. (See id. at 59:1-60:1.) Harris-Anderson told the Ombudsman that she had received a telephone call from one of her workers that there was no meat for the chef's salad. (Id. at 59:13-17.) Crump and Knox-Binion testified that they had no knowledge of Harris-Anderson meeting or speaking to the Ombudsman. (ECF No. 27-2 ¶ 45.) Harris-Anderson testified that Knox-Binion called her to Knox-Binion's office and Harris-Anderson spoke with the Ombudsman there, in the presence of Knox-Binion. (See ECF No. 35-3 at 59:1-60:1.) Harris-Anderson testified that after the Ombudsman had left, Knox-Binion asked Harris-Anderson if "she knew what she had done by speaking with the ombudsman." (Id. at 71:13-23.)

Following the Ombudsman's visit, Harris-Anderson and Jewell were suspended pending Quince's internal investigation into the chef's salad incident. (See ECF Nos. 58-62.) After the internal investigation, Knox-Binion determined that Harris-Anderson had committed misconduct by failing to report the chef's salad incident to her and had failed to meet job requirements by not ordering the appropriate supplies to ensure that turkey was available on August 3, 2018. (See ECF No. 70.) On August 14, 2018, Harris-Anderson was terminated. (ECF No. 27-5 at 16.) Jewell was issued a final written warning, but was not terminated. (ECF No. 27-2 ¶ 73.)

After the Ombudsman's visit, the TDH sent a surveyor to investigate the Chef's Salad incident. (ECF No. 35-2 ¶ 75.) After investigating, the surveyor concluded that Quince had not violated any federal or state regulations. (Id. ¶¶ 80-81.)

In November 2018, Harris-Anderson brought a complaint for retaliatory discharge in Tennessee state court. (ECF No. 1-1 at 2-7.) On January 10, 2019, Quince removed the case to this Court. (ECF No. 1 at 1-5; No. 1-1 at 9.) On January 30, 2020, Quince filed its Motion for Summary Judgment. (ECF Nos. 27-28.)

## II. Jurisdiction and Choice of Law

The Court has diversity jurisdiction. 28 U.S.C. § 1332. The amount in controversy exceeds $75,000. Harris-Anderson seeks $100,000 in compensatory and $100,000 in punitive damages. (ECF No. 1-1 at 6 ¶¶ (c) & (d).)

The parties are completely diverse. Vanessa Harris-Anderson is a citizen of Tennessee. (ECF No. 1-1 ¶ 1.) Quince is a Tennessee limited liability company. (Id. ¶ 2.) For purposes of diversity jurisdiction, limited liability companies have the citizenship of each of their members. Americold Realty Tr. v. Conagra Foods, Inc., 136 S. Ct. 1012, 1015 (2016) (citing Carden v. Arkoma Associates, 494 U.S. 185, 195-96 (1990)); accord Delay v. Rosenthal Collins Grp., LLC, 585 F.3d 1003, 1005 (6th Cir. 2009). The members of Quince are D&N, LLC and DTD HC, LLC. (ECF No. 1 ¶ 14.) D&N and DTD are New York limited liability companies.

6

(Id.)  D&N's members are Norbert A. Bennett, the Norbert A. Bennett Children's Trust, and the Norbert A. Bennett Grand-Children's Trust.  (Id. ¶ 15.)  Bennett is a citizen of New York.  (Id.)  The citizenship of a traditional trust is that of its trustee.  See GBForefront, L.P. v. Forefront Mgmt. Grp., LLC, 888 F.3d 29, 38-40 (3d Cir. 2018) (citations omitted); Tyson v. Lakeland Nursing & Rehab. Ctr., LLC, No. 3:15-cv-571, 2015 WL 13650756, at *5 (S.D. Miss. Dec. 11, 2015).  The trustee of the Norbert A. Bennett Children's Trust and the Norbert A. Bennett Grand-Children's Trust is Ronald Bennett, who is also a citizen of New York.  (ECF No. 1 ¶ 15.)  DTD's members are Donald T. Denz and the Donald T. Denz Irrevocable Trust.  (Id. ¶ 16.)  Denz is a citizen of New York.  (Id.)  The trustee of the Donald T. Denz Irrevocable Trust is Martin Clifford, who is also a citizen of New York.  (Id.)

The Court has diversity jurisdiction because the parties are completely diverse and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332.

Federal courts sitting in diversity apply state law to issues of substantive law and federal law to procedural issues.  Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427 (1996) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78-80 (1938)).  When there is no dispute that a certain state's substantive law applies, the court need not conduct a choice-of-law analysis sua sponte.  See GBJ Corp. v. E. Ohio Paving Co., 139 F.3d 1080, 1085 (6th Cir.

1998).   The parties assume in their respective briefs that Tennessee substantive law governs Harris-Anderson's claims.   The Court will apply Tennessee substantive law.

### III. Standard of Review

Under Federal Rule of Civil Procedure 56(a), a court must grant a party's motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The moving party must show that the nonmoving party, having had sufficient opportunity for discovery, lacks evidence to support an essential element of her case.   See Fed. R. Civ. P. 56(c)(1); Peeples v. City of Detroit, 891 F.3d 622, 630 (6th Cir. 2018).

When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine dispute for trial.   See Fed. R. Civ. P. 56(c).   "A 'genuine' dispute exists when the plaintiff presents 'significant probative evidence' 'on which a reasonable jury could return a verdict for her.'" EEOC v. Ford Motor Co., 782 F.3d 753, 760 (6th Cir. 2015) (en banc) (quoting Chappell v. City of Cleveland, 585 F.3d 901, 913 (6th Cir. 2009)).   The nonmoving party must do more than simply "show that there is some metaphysical doubt as to the material facts." Lossia v. Flagstar Bancorp, Inc.,

8

895 F.3d 423, 428 (6th Cir. 2018) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Although summary judgment must be used carefully, it "is an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action[,] rather than a disfavored procedural shortcut." FDIC v. Jeff Miller Stables, 573 F.3d 289, 294 (6th Cir. 2009) (quotation marks and citations omitted).

**IV.  Analysis**

Under the TPPA, it is unlawful to discharge an employee "solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b); see also Rhea v. W. Tenn. Violent Crime & Drug Task Force, No. 2:17-cv-02267, 2018 WL 7272062, at *6 (W.D. Tenn. Dec. 12, 2018). "[I]llegal activities" are defined as "activities that are in violation of the criminal or civil code of [Tennessee] or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(a)(3); Weinert v. City of Sevierville, No. 201800479COAR3CV, 2019 WL 319892, at *5 (Tenn. Ct. App. Jan. 23, 2019).

The elements of a retaliatory discharge claim under the TPPA are: "(1) the plaintiff was an employee of the defendant; (2) the plaintiff refused to participate in or remain silent about illegal activity; (3) the defendant employer discharged or terminated the

9

plaintiff's employment; and (4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity." Weinert, 2019 WL 319892, at *5 (citing Webb v. Nashville Area Habitat for Humanity, Inc., 346 S.W.3d 422, 437 (Tenn. 2011); Sykes v. Chattanooga Hous. Auth., 343 S.W.3d 18, 27 (Tenn. 2011); and Williams v. City of Burns, 465 S.W.3d 96, 111 (Tenn. 2015)).  The second element -- plaintiff's refusal to remain silent about an illegal activity -- requires a plaintiff to "identify a specific statutory or regulatory provision that was implicated by h[er] employer's conduct," and show that her "whistleblowing activity 'serve[d] a public purpose [that] should be protected.'" Konvalinka v. Fuller, No. E201700493COAR3CV, 2019 WL 2323831, at *5 (Tenn. Ct. App. May 31, 2019) (citing Guy v. Mut. of Omaha Ins. Co., 79 S.W.3d 528, 537 n.4 (Tenn. 2002)).  "[A]n employee cannot meet [the second element] simply by claiming that [s]he believed h[er] employer's actions were 'wrong' or against 'public policy.'" Richmond v. Vanguard Healthcare Servs., LLC, No. M201402461COAR3CV, 2016 WL 373279, at *6 (Tenn. Ct. App. Jan. 29, 2016).

At summary judgment, retaliatory discharge claims proceed using a burden-shifting framework:

> (1) First, the plaintiff has the burden of establishing a prima facie case of retaliatory discharge by a preponderance of the evidence;

(2)  If the plaintiff establishes a prima facie case for retaliatory discharge, the defendant must produce evidence of one or more legitimate, non-retaliatory reasons for the discharge. This is a burden of production, not persuasion;

(3)  If the defendant produces evidence of a non-retaliatory reason for the discharge, the plaintiff's prima facie case is rebutted, and the burden shifts to the plaintiff to demonstrate that the reason given by the defendant was only pretext for unlawful retaliation.

Sweat v. City of McMinnville, No. M201701141COAR3CV, 2018 WL 1448740, at *3 (Tenn. Ct. App. Mar. 23, 2018) (citing Tenn. Code Ann. § 50-1-304(f)); see also Williams, 465 S.W.3d at 111 n.15. Establishing a prima facie case is a "formidable burden," Clark v. Hoops, LP, 709 F. Supp. 2d 657, 670 (W.D. Tenn. 2010) (citing Hill v. Perrigo of Tennessee, No. M2000-02452-COA-R3CV, 2001 WL 694479, at *5 (Tenn. Ct. App. June 21, 2001)), and requires meeting a "stringent standard," Williams, 465 S.W.3d at 110.

The first and third elements are not in dispute. (ECF No. 27-1 at 4.) Quince argues, inter alia, that Harris-Anderson cannot succeed on the second element because she cannot "identify a specific statute or regulation" that Quince violated, and that she alleges only a general violation of public policy. (See id. at 5-8.) Quince alternatively argues, inter alia, that Harris-Anderson cannot establish the fourth element of her claim because her conversation with the Ombudsman was not the sole reason for her termination. (Id. at 9-13.) Quince's first argument is

sufficient.  Harris-Anderson cannot establish a prima facie case because she fails to cite a specific statutory or regulatory provision that Quince violated.

To establish a prima facie case of retaliatory discharge, Harris-Anderson must prove that she refused to participate in or remain silent about illegal activity.  That requires "identify[ing] a specific statutory or regulatory provision that was implicated by [the] employer's conduct."  Konvalinka, 2019 WL 2323831, at *5.

Harris-Anderson identifies no law or regulation.  She asserts that she had a "real" and "reasonable" belief that regulations governing the facility had been violated.  (ECF No. 35-1 at 14-16.)  She testified that she did not think serving the salad without meat was illegal.  (ECF No. 35-3 at 60:12-14.)  She testified she "believe[d] something was going to happen" because the facility did not serve meat on the salad.  (Id. at 60:2-5.)  She testified she thought not serving meat was against the dietary regulation of "not having the proper protein that [the residents] needed."  (Id. at 60:15-20.)  Harris-Anderson argues that, "the fact that [she] did not state a specific regulation does not remove the fact that there were, in fact, regulations that required that meals served to the residents of [Quince] [contain] a certain amount of protein."  (ECF No. 35-1 at 16.)

The "dietary regulation" to which Harris-Anderson refers is Quince's internal Menu Guidelines that list "6 Ounces of Edible Protein" as part of the "Daily Menu Requirements." (ECF No. 28-3 at 2.)  Quince's internal dietary guidelines are not an applicable "regulation" protected by the TPPA because they are not a regulation or law of the State of Tennessee or the United States.[2] See Tenn. Code Ann. § 50-1-304(a)(3).

Harris-Anderson argues that "the TPPA's 'protection extends to employees who have reasonable cause to believe a law, regulation, or rule has been violated or will be violated, and in good faith report it.'"  Gore v. Chardonnay Dialysis, Inc., No. 3:11-cv-00808, 2012 WL 3552882, at *8 (M.D. Tenn. Aug. 16, 2012) (quoting Mason v. Seaton, 942 S.W.2d 470, 472 (Tenn. 1997)); (ECF No. 35-1 at 13-15).  That is true.  A plaintiff need not prove that a law or regulation was violated to succeed on the second element.  See Mason, 942 S.W.2d at 472.  But a specific law or regulation must still be identified.  Konvalinka, 2019 WL 2323831, at *5 (citing Gossett v. Tractor Supply Co., 320 S.W.3d 777, 788-89 (Tenn. 2010); and Mason, 942 S.W.2d at 472)).

---

[2] Federal and state regulations require that Quince meet the nutritional needs of residents in accordance with established national guidelines and recognized dietary practices, but do not state a specific amount of protein each resident must receive per day or meal.  (ECD No. 27-2 ¶¶ 18-19.)  Harris-Anderson does not cite those federal or state regulations or argue that her claim arises from violation of those regulations.

Harris-Anderson's general statements that she thought Quince had violated some dietary regulations are insufficient. See Clark v. Hoops, 709 F. Supp. 2d 657, 670-71 (W.D. Tenn. 2010) (granting summary judgment where plaintiff alleged he was terminated for "reporting building and safety code violations to the Shelby County building inspector" but failed to identify a specific statute or regulatory provision); Sanders v. Henry Cty., No. W200801832COAR3CV, 2009 WL 1065916, at *11 (Tenn. Ct. App. Apr. 21, 2009) ("Plaintiff did not establish this essential element of his statutory retaliatory discharge claim simply by stating his belief that [defendant's] actions were wrong.").

Harris-Anderson's failure to identify a specific law or regulation is fatal to her prima facie case. See Tidwell v. Holston Methodist Fed. Credit Union, No. E201901111COAR3CV, 2020 WL 3481537, at *3 (Tenn. Ct. App. June 25, 2020) (TPPA claim "fail[ed] as [a] matter of law" because plaintiff's allegations in support of her claim "fail[ed] to identify any sections of the Tennessee or United States Code or any regulations intended to protect the public health, safety, or welfare") (citation omitted). Harris-Anderson's TPPA claim fails as a matter of law.

In her brief, Harris-Anderson argues that she brings a common law retaliatory discharge claim as well as a TPPA retaliatory discharge claim. (See ECF No. 35-1 at 10-11.) Her common law retaliatory discharge claim fails because the 2014 amendments to

the relevant section of the TPPA expressly abrogated common law retaliatory discharge claims for refusing to remain silent about illegal activities.  Tenn. Code Ann. § 50-1-304(g); <u>Williams</u>, 465 S.W.3d at 110 n.11.

Quince's Motion for Summary Judgment is GRANTED.

**V.   Conclusion**

For the foregoing reasons, Quince's Motion for Summary Judgment is GRANTED.

So ordered this 5th day of August, 2020.

/s/ *Samuel H. Mays, Jr.*
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE